[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Review of the File
This matter first came to the court by virtue of a complaint dated December 7, 2000 and returnable January 16, 2001, in which complaint the plaintiff petitioner asked for or claimed a dissolution of marriage, custody, custody pendente lite, joint custody, joint custody pendente lite, support, support pendente lite, alimony, alimony pendente lite, an allowance to prosecute, an allowance to prosecute pendente lite, an allocation of debt, an allocation of debt pendente lite, an assignment in and to the defendant's real and personal property including but not limited to interest in any retirement plans, stocks, savings, investment CT Page 708 plans, proceeds from lawsuit settlements and the like, that the plaintiff retain her interest in the residence located at 86 McKinley Avenue, Norwich; also, a restraining order preventing the defendant from dissipating his annuity retirement funds or any other funds he receives as a settlement from any pending litigation, a fair and equitable division of personal property, any other and further relief the court deems appropriate.
Accompanying the complaint, the same being dated December 7, 2000, was a pendente lite motion for custody, joint custody, access to non-custodial parent, alimony, allowance to prosecute, allocation of debt, exclusive use and possession of the marital residence.
Additionally accompanying the complaint was a motion to enjoin dated December 7, 2000 as concerns a certain worker's compensation settlement and funds incident thereto. The usual automatic orders accompanied the complaint as well as the return of the sheriff indicating in-hand service on the defendant.
On December 18, 2000, the defendant appeared by counsel.
On January 16, 2001, the defendant filed a motion for joint custody pendente lite as concerns the minor children. That motion was acted on by the court, Kenefick, J., on May 7, 2001 wherein the court accepted the agreement of the parties dated May 7, 2001.
On January 16, 2001, the defendant filed a motion for defined access pendente lite, which was acted upon by the court, Kenefick, J., incident again to an agreement of the parties dated May 7, 2001.
On January 23, 2001, the plaintiff filed a motion for a restraining order but the file does not reflect that the motion was acted upon.
On April 17, 2001, the plaintiff filed a pendente lite motion as concerns an accounting as concerns certain alleged winnings of the defendant from a casino. The file does not disclose whether or not that motion was acted upon.
On May 7, 2001, the court, Kenefick, J., referred the file to Family Relations for the determination of issues as to visitation and mediation. The file reflects that there was filed on May 7, 2001 a certain document entitled "Agreement of the Parties Pendente Lite," having to do with matters of visitation involving the minor children.
On May 31, 2001, the plaintiff filed a motion to compel, motion for sanctions as concerns certain alleged winnings by the defendant at a CT Page 709 casino.
On May 31, 2001, the plaintiff filed a pendente lite motion requesting alimony.
On September 20, 2001, the case was dismissed for failure to file a CMA by the court, Devine, J.
On October 1, 2001, the judgment of dismissal was vacated by the court, Devine, J.
By a motion dated October 18, 2001, the plaintiff filed a motion to compel and a motion for sanctions as concerns certain disclosure in production and verification as to assets.
By virtue of a motion dated October 18, 2001, the plaintiff filed a motion for contempt, a motion with regard to claimed violation of the standing orders.
On November 6, 2001, the plaintiff filed a motion for counsel fees.
On November 6, 2001, the plaintiff filed a motion to compel/request for authorization as concerns endeavoring to verify certain wagering or betting at a casino and the results thereof This motion was acted on by the court, Devine, J., on November 19, 2001 wherein the court directed both parties to execute requisite or required releases to the subject casinos in order to secure the requested information. The order by the court, Devine, J., also directed that the defendant should provide releases for the purpose of the plaintiff being able to verify the status of the defendant's worker's compensation claims.
On November 19, 2001, the court accepted an agreement of the parties dated November 19, 2001 incident to certain authorization as concerns verification of the defendant's earnings and directed to his employer and in addition to provide verification or authorization with regard to any earnings or receipts from Social Security.
By virtue of a motion dated October 30, 2001 and filed December 3, 2001, the plaintiff requested that the court issue an order compelling the defendant to comply with certain outstanding requests and sanctioning the defendant.
The plaintiff and the defendant with their respective counsel and their witnesses appeared before the court on December 13, 14, 18 and 19, 2001 and the mailer was heard to a conclusion. CT Page 710
The court makes the following findings of fact:
From the testimony of the plaintiff petitioner, the court finds that the plaintiff's maiden name was Virginia Grayson and that the plaintiff and the defendant were united in marriage on July 16, 1988 in Loveland, Colorado.
The court granted at time of trial an oral motion to correct the date of the marriage, which in the complaint was referred to as July 15, 1988.
Both parties have resided in Connecticut for more than one year prior to the bringing of this petition, and the court has jurisdiction.
There are three minor children issue of this marital union; Joseph Scott Defosse, born March 11, 1989, David Louis Defosse, born October 29, 1991, and Maria Rose Defosse, born April 21, 1995.
The marriage between the parties has irretrievably broken down with no reasonable prospect or hope for reconciliation.
Neither party has been the recipient of welfare or assistance from either the State or any town, city, municipality or subdivision thereof during the course of the marriage.
No children other than the aforementioned three children have been born to the plaintiff during the term of the marriage.
In her testimony, the plaintiff petitioner asked for a dissolution of the marital union, joint legal custody of the three children, 4hat she should be the primary physical custodial parent.
In addition to the foregoing, the court finds from the plaintiff's testimony that the plaintiff has not been aware of the residence of the defendant for the last four years. The plaintiff's impression was to the effect that the defendant has resided in at least four unknown locations during the last four years. The plaintiff testified that to the best of her knowledge and belief that the defendant had no in-service mobile phone by which she could contact.him during that time frame.
According to the plaintiff the defendant took the children once overnight in the last six months and that the oldest child, Joseph Scott Defosse, was taken once to participate in a hunting outing with his father.
The plaintiff testified that she has not been obstructive nor CT Page 711 endeavored to block visitation by the defendant with the children.
According to her testimony, on some occasions the defendant will call often times late when he has no intention of appearing for visitation.
The plaintiff acknowledges the necessity for an appropriate visitation schedule between the defendant and the children.
The plaintiff describes the defendant as being addicted to alcohol and that to her knowledge he has been arrested on three separate occasions for operating under the influence. The plaintiff, by virtue of the nature of her work, is familiar with social mailers pertaining to alcohol and the immoderate use thereof
It is the plaintiff's request that any visit by the defendant with the children should be alcohol free.
The plaintiff's testimony was to the effect that the defendant engages in violent conduct when he is drinking and recited an incident where the plaintiff was washing dishes in the sink at the home and residence, and on that occasion, according to her testimony, the defendant attempted to strangle her. In self defense on that occasion, the plaintiff testified that she grabbed a piece of cutlery and struck the defendant.
The plaintiff testified that there were at least four violent incidents where violence was done to her person by the defendant.
Even during the periods of visitation during the pendency of this petition, the plaintiff testified that on the occasions when the defendant would arrive, he would have alcohol on his breath. The plaintiff testified that the defendant drinks while he has the children incident to visitation arrangements and, as indicated, the plaintiff is desirous of all visits being alcohol-free.
The plaintiff affirmed her request for a dissolution of the marital union.
She described the problems that beset the marriage as alcohol related and gambling related.
According to her testimony, the defendant in 1995 arranged for a tax exempt status for a period of one year at his place of employment. The same to preclude withholding of various and sundry taxes incident apparently to the attempt to start some sort of business activity or endeavor on his own. CT Page 712
As a result of this and its continuing beyond the time intended, the plaintiff and the defendant ended up owing over $10,000.00 in penalties to tax authorities, Internal Revenue Service, State of Connecticut. There still is, according to the plaintiff, $1,600.00 of that debt still outstanding.
Her testimony indicated that of the sum originally owed that over $4,000.00 was due to the Internal Revenue Service and over $1,000.00 was due to the State of Connecticut. Manifestly the amounts must have been greater in order to arrive at the total figure of $10,000.00.
In order to prevent action by the taxing authorities as to the home, the plaintiff took out a loan to pay off a lien that had been placed on the home removed, which she was eventually able to achieve.
The plaintiff testified as to the activities of the defendant spending money on gambling. Her credible testimony was to the effect that during a certain six month period that the defendant ran up $10,000.00 in gambling debts.
According to the plaintiff, the defendant was verbally abusive to her and that nothing that she did pleased the defendant.
Her testimony indicated that on an occasion the defendant kicked her in the side while she was in a pregnant status. A photograph showing the claimed injuries was entered as Plaintiff's Exhibit 5.
The plaintiff indicated that mindful of the three children issue of this marriage that when the defendant would learn that the plaintiff was pregnant he would leave and not return until after the child or children were born.
The plaintiff, according to her testimony, has filed four prior petitions seeking a dissolution of the marital union. Three were filed and subsequently withdrawn or not pressed by her present attorney, Attorney Clark, and one by the firm of Traystman, Coric and Keramidas, which also apparently was not pressed to a conclusion.
The plaintiff professed that in all respects she had endeavored to live up to her marital vows while the parties resided together and represented that she was not at fault with regard to the problems in the marriage and even on the occasion of physical assaults that she would not fight back.
On an occasion in April of 1999 celebrating the plaintiff's birthday, the plaintiff's testimony was to the effect that the defendant was rude and belligerent to her and that at the restaurant location where the CT Page 713 parties had gathered that she fell, was hurt, received a laceration on her throat, a swollen ear and a cut on the ear. After that event, the parties separated for good.
The plaintiff's allegations and testimony are to the effect that the defendant precipitated and caused her fall and the injuries that she sustained on that April 1999 occasion.
The plaintiff suggested and offered marital counseling to the defendant but apparently to no avail.
The minor children are covered as concerns medical insurance through the defendant's employment as an ironworker and the plaintiff is desirous of having the defendant continue to do that.
The plaintiff, in a separate matter, petitioned the Support Enforcement Unit and the then presiding magistrate for a support order for the minor children, which was in due course granted and which the court will touch on in due course.
The home of the parties at 86 McKinley Avenue was owned or acquired by the plaintiff prior to her marriage to the defendant.
According to her testimony, the purchase price at the time of its acquisition was $68,000.00; the same being provided by a $10,000.00 deposit and a $57,000.00 mortgage balance. The plaintiff presently owns the property in her own name and valued the same according to her testimony at $85,000.00+. She described it as a four bedroom house,1-1/2 baths, that the home was 78 years old but perhaps much older, that it was in need of having siding replaced and windows replaced, repairs needed to kitchen cabinets.
During the period 1988 to 1998, according to the plaintiff, the defendant was frequently in and out of the premises and was never there for more than a period of two years in a continuous pattern.
As noted earlier, the defendant on learning of her being pregnant would disappear or leave for the subsequent eight month period of time. The plaintiff on these occasions would try to find the defendant for child support, to no avail.
With regard to certain projects undertaken on the home premises, those that were started by the defendant, according to the plaintiff, were never finished except for a certain air conditioning project.
According to her testimony, ten years ago a new roof was put on the CT Page 714 property and the cost thereof, $7,500.00, was paid by the plaintiff after she had secured said sum from her, parent father.
The plaintiff testified that there was a time when the defendant bought some sort of boat and as her memory served her, for a time the title to the vessel was in both names. That apparently is no longer the case.
The plaintiff's present employment is with Southwestern Mental Health, a relatively new position; the actual overall employer being the State of Connecticut.
The plaintiff's education extended beyond high school for one year in college and she has been working on either a full or a part-time basis for the State since 1978.
In addition to the three children of this union, there are two other children who have been members of the household, children of the plaintiff in prior unions. The defendant, however, not being the parent.
The plaintiff's testimony was that she is still on a fractional time frame basis with her employment and that her hourly rate is $24.28 for 24 hours. Some overtime is on occasion available and some times she is able to work as much as 32 hours a week.
The plaintiff receives $75.00 a week child support that is paid to her not from the defendant but from another party incident to the two other children mentioned.
The monthly mortgage payment for the residence and home premises is $648.24. This includes taxes and insurance.
The plaintiff referred to a certain debt in the amount of $4,500.00 due to Beneficial Loan Company incurred to pay off the lien on the home which she requests that the defendant be ordered to pay. In addition, the plaintiff claims that the defendant should be responsible for the Sears card debt and the First USA 2000 obligation. The CitiBank obligation of $4,300.00 is still outstanding and the defendant, according to her testimony, has paid nothing on these debts. The debt to Finger Hut, the plaintiff acknowledges as hers and she will be responsible for that.
The plaintiff characterized the home furnishings as being of negligible value.
The boat earlier referred to has not been seen by the plaintiff since 1999. CT Page 715
The plaintiff has some modest life insurance; the children being beneficiaries.
Prior to the dissipation of the same, the defendant had an annuity incident to his employment as an ironworker with the Berlin Iron Works.
In 1998, the plaintiff testified that she became aware of the fact that the value of this annuity was in excess of $100,000.00 and that the defendant had acknowledged its existence to her.
In July of 1999, according to her testimony, the defendant took from the annuity fund whatever then was available after certain penalties and/or taxes and received the same into his possession. Incident to that transaction, the defendant required that the plaintiff sign an authorization for release of these benefits and the arrangement was to the effect that supposedly each was to receive one half thereof Plaintiff's Exhibit 7 touches on this and will be described in greater detail later in the memorandum.
The plaintiff accepting and believing in the representations of the defendant signed the required authorization and release. The defendant indicating that he would take one half of the proceeds for the purpose of purchasing a home and that the other one-half would be set over to the plaintiff for a prospective educational fund for their three children.
At the time of the securing of these annuity funds by the defendant, he was receiving worker's compensation benefits.
It was only at a subsequent pre-trial conference before the trial in chief that the plaintiff learned that the defendant had received the requisite funds. The same had not been presented to her for signature and she was never the recipient of any portion thereof.
In explaining where the funds went, on inquiry by the plaintiff of the defendant, he stated that he did not want "a fat F to get his hands on the money."
The defendant disclosed and represented to the plaintiff that he had gambled the entire proceeds away. At this time, the defendant also told the plaintiff tat he had a worker's compensation case and would receive certain funds in due course.
At a point in time, the defendant was injured on the job as an ironworker and had two or three discs removed from his neck. The defendant who has been engaged in this type of work for a number of years, on occasion, is in a foreman capacity and, on occasion, a general CT Page 716 foreman capacity.
The plaintiff requests one-half of any accrued pension benefits available to the defendant.
During any period of suspension of the aforementioned three DWI's, the plaintiff would drive the defendant back and forth to work in order that he might not lose his position.
According to the plaintiff, she observed his gambling on occasion, that he would gamble for days in succession, and the plaintiff believed that her signature would be required on any check or draft as concerns the release of the annuity funds and feels that the defendant deceived her in that respect.
In her testimony, the plaintiff acknowledged that this is her third marital union; the first marriage was, according to her testimony, annulled; the second resulted in a divorce after three years in length.
The plaintiff acknowledged that on occasion when the defendant was working as an ironworker that there would be times when he would give her $500.00 a week for expenses. The plaintiff acknowledged that she has visited the casinos, Foxwoods and Mohegan Sun, but has never gambled more than $20.00 at said establishment.
The plaintiff acknowledged that there is a protective order now in place in her favor. She testified that she has never struck the defendant except in self defense, never vandalized any of his possessions and acknowledged that on average she has earned as much as $35,000.00 a year.
The plaintiff has no record of any arrests according to the testimony.
On occasion, the plaintiff has spoken with Family Relations.
The home occupied by the plaintiff and the children was purchased in 1984 and after the initial purchase, there was one occasion on which the property was refinanced. At the present time the plaintiff is the sole owner of the equity.
According to the plaintiff's testimony, the real estate assessment by the Town of Norwich is to the amount of $68,000.00.
The plaintiff acknowledged that the defendant assisted in putting a new roof on the residence and doing some air conditioning duct work. CT Page 717
The child known as Elizabeth Minsky is a child of a prior marital union involving the plaintiff
In terms of personal property, the plaintiff acknowledged that she has several televisions and two VCR's. The plaintiff indicated a willingness to share family photographs plus a certain deer wall mount with the defendant, plus she had no problem with regard to his retaining any and all of his tools. The plaintiff represented that the sum of $11,500.00 was secured in times past incident to an insurance settlement and that those funds were used to repair the porch on the property.
Insofar as the present status of the record title of the plaintiff's home, that dates from July of 2000.
It was the plaintiff's intention to use the promised one half of the funds formally in an annuity form held by the defendant for the prospective education of the three minor children issue of this relationship.
The plaintiff acknowledged that after a lengthy final separation between the parties that she had been indiscreet with a certain Peter Reynolds.
The plaintiff represented that in the past that the defendant had resided with a woman friend.
The plaintiff testified that the cash out value of her pension presently is $12,000.00~.
The plaintiff is desirous of having the court grant her one half of the defendant's pension benefits. The plaintiff's testimony was to the effect that the defendant, now on most occasions, acts as a foreman and sometimes chief foreman in the iron work industry.
The present outstanding order of support from the defendant to the plaintiff is to the amount of $273.00 a week.
According to the plaintiff's testimony, the support as of December 14, 2001 amounted to being two weeks delinquent.
The plaintiff represented that from the date of the marriage in 1988 to the year 2000 that she had remained faithful to the defendant and had not committed any indiscretions.
The plaintiff testified that she observed the defendant on a past occasion with another lady by the name of Shirley Daniels and that the CT Page 718 defendant had admitted other indiscretions to her.
The testimony would seem to suggest for one reason or another that the defendant has filed no income tax returns for the last three years.
The plaintiff pays for tuition at a Catholic school for the three children; this apparently in the amount of $1,900.00 a year, and indicated that the defendant contributed nothing to this cause.
The plaintiff acknowledged that on occasion that the defendant did call the children by phone. That to the best of her knowledge and belief the defendant had recently been working at an iron work project in Fishkill, New York.
From the testimony of the witness Robert Veneziano, the court finds Mr. Veneziano is employed by the State of Connecticut, Support Enforcement Division of the Superior Court. He has held this post for a period often years. He is familiar with the Defosse file that was opened on January 7, 2000 concerning the order of $273.00 weekly for support. This order was effective January 8, 2000 and was predicated upon the defendant's earnings at the time of its implementation to the amount of $1,180.00 a week gross, $804.00 net. This witness audited the Defosse account and at one time it was delinquent to the amount of $1,482.17. The last payment reflected on this witness' records was December 2, 2001.
From the testimony of the witness Robert Barlow, the court finds that Mr. Barlow is acquainted with the plaintiff and the defendant. He has been acquainted with the defendant since he was a child. He was frequently in the company of both the plaintiff and the defendant.
This witness testified that he witnessed violence inflicted on the plaintiff by the defendant at a time when she was eight months pregnant. He testified hearing her scream and holler, that the defendant had shoved her, that the defendant had backhanded the plaintiff The witness apparently endeavored to intervene in the altercation and struck the defendant. The testimony was to the effect that two police cruisers came to the location and that the defendant was removed. His testimony was to the effect that the plaintiff forgave the defendant as concerns his conduct occurring the night before. This forgiving done on the next morning. This witness testified that he observed many instances of violence by the defendant on the person of the plaintiff.
This witness acknowledged on occasion drinking alcoholic beverages with the defendant.
This witness was not subpoenaed to court and allegedly has, according CT Page 719 to the testimony, a misdemeanor record.
The witness acknowledged that at one point in his life he had a drinking problem.
He testified that he is no longer a friend of the defendant.
From the testimony of the witness Dorothy Geraghty, the court finds that the witness is related to the plaintiff; that the relationship is that of siblings, being a sister to the plaintiff. This witness testified as to having seen abuse inflicted by the defendant on the person of the plaintiff, both physical and mental. The witness indicated that there was name calling by the defendant to the plaintiff and described some of the words used by the defendant, the recitation of which would serve no useful purpose at this point. This witness has witnessed pushing and shoving by the defendant on the person of the plaintiff
This witness observed events in 1999 and 2000 when there were altercations concerning the defendant's drinking and gambling. According to this witness, the defendant had indicated that he would continue a policy of improvident gambling. This witness testified as to observing the defendant at the blackjack table at the casino where the minimum table limit was $25.00 a hand. This witness also observed the defendant wager as much as $500.00 a hand at Mohegan Sun.
This witness is employed at Foxwood's and has seen the defendant there. Her testimony was to the effect that the defendant drinks hard liquor, drinks heavily and consistently; that the defendant has been observed intoxicated at the casino. The witness testified that the plaintiff does not imbibe in strong drink, at least as observed by the witness.
This witness acknowledged that she had been brought up in an abusive family setting. This witness testified that at one time she observed the defendant win between $8,000.00 and $10,000.00 in the Fall of the year 2000. The defendant on that occasion lent a modest sum to the witness from his then winnings.
This witness has seen the defendant with the three children at the casino in the company of the plaintiff
This witness acknowledged that she had a record of two arrests in the past and may have been diagnosed as manic depressive and is on a medication known as Prozac.
This witness has participated in gambling episodes with the defendant CT Page 720 on as many as 30 occasions.
From the testimony of the witness Peter Nystrom, the court finds that he is acquainted with the plaintiff and the defendant since the time of the wedding of the parties in 1988. The plaintiff, at some time in the past, prior to this union, was married to this witness' brother
This witness described the plaintiff as a wonderful and caring parent.
This witness described the defendant consuming alcoholic beverages and that he was aware of violence inflicted on the plaintiff, but after the fact.
This witness was aware of the extended absences of the defendant during the plaintiff's several pregnancies. This witness endeavored to assist and help the plaintiff on occasion. He babysat for the children and noted that the plaintiff's parent mother on occasion provided financial help and assistance to the plaintiff
The plaintiff complained to this witness Nystrom with regard to the defendant being absent for long periods of time during her pregnancies.
The witness Nystrom indicated that the three children of the plaintiff and the defendant were well cared for by the plaintiff
The witness Nystrom observed bruises on the face of the plaintiff on occasion and he indicated that in his words, the plaintiff lives for her children and not for herself
From the testimony of the defendant, the court finds that the defendant currently resides at 44 Capitol Avenue in the City of New Britain. He has been at this residence for about the last 30 days. He resides there with one Paul Lane as a roommate. Prior residences were at the Holiday Inn in New York; that apparently being on the occasion of his iron working at an out-of-state job.
At an earlier point, the defendant had occupied an apartment in Salem for about five months where the monthly rental was $650.00.
The defendant receives $25.00 a day travel expenses when it is appropriate incident to the nature of the work that he does and the travel incident thereto.
On an earlier occasion, insofar as residences were concerned, the defendant also had resided in a rented trailer. CT Page 721
The defendant's current rent, according to his testimony, is $600.00 a month and he indicated that his roommate Lane contributes $50.00 a week toward the same.
The defendant indicated that he was not presently receiving travel allowed expenses.
The defendant is age 39. Insofar as his health is concerned, he indicated that he had some injuries due to his work. His education extended through securing a GED.
He is a member of Local 15 of the Ironworkers' Union. From the time of the marriage he has been a member of the Local. On occasion he now acts as a foreman and has intermittently acted in that capacity over the last five years. His rate of pay when he works in that capacity is $27.50 an hour. Bad weather oftentimes precludes full work weeks. The work is also apparently of a dangerous nature.
On July 20, 2000, the defendant took certain monies from his annuity plan which had been in existence for some time. After securing the plaintiff's signature, incident to which he made certain promises, he apparently received a check that was made out to the defendant alone. The check, according to his testimony, being in the amount of at least $86,000.00. The defendant never told the plaintiff nor disclosed to her that he had received these monies although he had made certain promises to the plaintiff incident thereto.
The defendant in due course spent the funds in gambling. The check apparently was cashed after the defendant walked around with it for some time and the cash was secured in various denominations. According to the defendant's testimony, a goodly portion thereof was gambled away shortly after the check was cashed at the Mohegan Sun Casino. The defendant never gave anything at all from these monies to the plaintiff
Incident to the defendant's gambling at the casino, he did not use his club card, sometimes called a wampum card, which would have kept a record of the gambling activity. The defendant apparently did not want any record of the gambling procedures to be kept.
The defendant apparently has no checking or bank account.
The defendant characterizes the plaintiff as being unworthy of trust or honesty.
The defendant, in his view, indicated that he felt he had no alcohol problem; however, the defendant acknowledged several convictions for CT Page 722 operating under the influence.
The defendant denied being with the minor children when he had consumed alcohol.
The defendant blames the plaintiff for the breakdown of the marriage.
The defendant acknowledged that he actually may have received as much as $90,000.00 from the annuity, all of which was lost, according to his testimony.
Incident to a December 1999 injury, the defendant was treated by a certain Dr. Druckemiller. His injury involved cervical discs 5 and 6 and he was apparently operated on for herniated discs in this location.
The surgery occurred three or four months after the injury as best he could recall, probably in April of 2000. At one time, the defendant was out of work because of the injury for about six months.
During his out-of work period, the defendant apparently received as much as $650.00 a week. The deductions for support were taken out of the same so that the amount available to the defendant was in the neighborhood of $400.00.
The defendant received eight weeks as a lump sum payment after he went back to work, plus apparently the sum of $4,000.00. The defendant testified as to certain work that he claimed he had done on the home residence including the installation of new ceilings, a new heating system, a new roof and a porch.
The defendant claimed that he had done certain sheetrock work, that he had installed a new bath on the third floor, new closets, wiring and matters of like nature.
The defendant indicated that the minor children are beneficiaries on his life insurance.
The defendant acknowledged that he presently had a 14-foot aluminum boat, previously had a 24-foot cabin cruiser, wood construction, for which he had paid $4,200.00. He owned the vessel in 1997 and still owns it, but offered no proof thereof or to its present whereabouts or situation.
The defendant made no request for alimony as against the plaintiff
The defendant professed, notwithstanding the foregoing, that he has no CT Page 723 gambling problem.
The defendant's testimony was to the effect that he attended Gambler's Anonymous, but that he did not remain with that program. The defendant also claims that he has attended AA and claims that he presently has no alcohol addiction problem.
He denied doing violence to the person of the plaintiff admitting only that he hit her once and that a 30-day jail sentence incident thereto apparently was served.
The defendant indicated that although requested he had not provided copies of any income tax returns to counsel for the last three years. The defendant has requested that the court grant to him all three of the tax exemptions as concerns the minor children issue of the marital union.
As concerns certain property reflected on the defendant's financial affidavit known as 21 Wightman Road in New London, the defendant's testimony is to the effect that he purchased this property several years ago and that the purchase price was $50.00. The defendant was not able to recall the date of the purchase nor the name of the seller. He described it as consisting of a small house on a modest plot that had been fire-damaged and condemned by the City. The defendant's testimony was to the effect that the taxes paid to the City of New London amount to $3,000.00± annually. The defendant presently apparently has no insurance on the property. He expects at some future date to try to repair and rehabilitate the property.
The witness previously noted, Dorothy Geraghty, was recalled to the stand and testified as concerns a certain conversation between the plaintiff and the defendant. Said conversation allegedly occurring after a pre-trial in which conversation it is represented that the defendant said to the plaintiff "that there would be no money for that fat F" referring to the money having been lost at the casino. The reference to the "fat" person allegedly had to do with the defendant's reference to a person that the plaintiff was allegedly seeing on occasion after the final separation.
Further, from the testimony of the defendant, his testimony was to the effect that the parties initially met at a Sheraton Hotel in 1988. The defendant apparently had not, prior to that point in time, been involved in any marital relationships.
The testimony indicated that the parties had a friendship for over a year and then were joined in marriage. CT Page 724
The defendant described the relationship between himself and the plaintiff as up and down, good times and bad times; that on the basis of the defendant's testimony, he gave the plaintiff $500.00 a week while he was working.
He testified that both of the parties cared for the children and spent time with them. The defendant indicated that he worked at various and sundry iron work or steel work at locations both in and out of the state.
The defendant's position was to the effect that the union has not been irretrievably broken down, but he accepts the pending petition and the plaintiff's wish to have the marriage dissolved.
The defendant testified that his education extended through securing a G.E.D. and that in a formal basis, it extended no further than the tenth grade.
Prior to 1985 the defendant worked at Electric Boat and became a first class welder. He left in 1985 to go with the ironworkers.
He described his health as fair, mindful of the cervical disc problem that he experienced as a result of an accident some time ago. This accident apparently occurred in 1999 in December at the Mohegan Sun Casino where a large structure was being erected which involved steel and iron work. Surgery was undergone in the Spring of 2000 under the supervision of Dr. Druckemiller at the Hartford Hospital. The discs involved were C5 and 6. A portion of one or more of the discs were removed.
Insofar as worker's compensation is concerned, it was determined that the injury was work related. The defendant testified tat he has no private counsel with regard to any pending worker's compensation claim. He indicated that the case file is open and that the back and neck problems still create problems for him.
The defendant's testimony was to the effect that he received worker's compensation benefits for six months; that being the period January of 2000 to the end of July 2000. His testimony was to the effect that he paid child support during this period of time, which appears to be accurate. The defendant's testimony was to the effect that he expects no more in the way of worker's compensation payments coming to him in the near future. He indicated that it has been determined that he has a 10% physical disability.
He indicated that the disability affects his sleep and some aspects of CT Page 725 his work. He experiences pain in his neck and numbness in his right arm. He apparently has no other health-related problems.
The defendant's testimony and the plaintiff's are at opposite ends of the spectrum with regard to his version as concerns the events that took place at the Chinese restaurant where a birthday celebration for the plaintiff occurred.
His testimony was to the effect that both of the parties had been drinking and it was the defendant's claim that the plaintiff caused his face to be struck by the container of what was described as a "Scorpion" drink.
It would appear, although it is unclear, that as a result of what occurred at that time, that the defendant was arrested. After that event, the defendant did not return to the home residence.
At a subsequent point in time, the testimony was to the effect that the plaintiff and the defendant went to Niagara Falls where, according to the defendant, the parties were intimate.
The defendant recounted an event where he claimed that he saw the plaintiff with, in his words, a boyfriend in a truck, and his son was in the vehicle at the time. The person named was a Mr. Reynolds.
The defendant acknowledged receiving the annuity proceeds fund which he described as amounting to $86,000.00. He testified that he cashed the check.
His testimony was to the effect that he was distraught when he saw the plaintiff and Mr. Reynolds and his son in the subject vehicle.
The defendant testified as concerns putting a deck on the home premises in an effort to please the plaintiff and improve the value of the property. After the defendant received the annuity check as noted above, he testified that he turned the same into cashier's checks and subsequently, in his words, gambled the money away at the casino.
The defendant's testimony was to the effect that the entire sum was gone within two months of the check being cashed.
The defendant claimed that the plaintiff on occasion would engage in violent conduct, but the court's observation of the plaintiff during these lengthy proceedings would appear to suggest that that claim was without merit. CT Page 726
The defendant claims that the plaintiff struck him on many and diverse occasions and assaulted him with a knife on three occasions. The court finds it difficult to accept that testimony mindful of the court's observations of the parties during the proceedings.
The defendant also claimed that the plaintiff struck him in the head with a phone which required nine stitches. No medical exhibit or independent testimony was presented to the court with regard to that claim.
The defendant claimed on occasion that the plaintiff would chase him around the house with a knife and that on one occasion he went to the Windham Hospital. The court notes that no medical record was presented as an exhibit nor any witness from the hospital facility testified during the proceedings.
The defendant also claimed that the plaintiff had stabbed him on occasion in the leg and twice in the arm. Again, no outside testimony nor exhibit was presented to verify these representations.
The defendant made like claim with regard to representing that the plaintiff tore holes in his clothing and matters of like nature. No items evidencing this claim of conduct were presented to the court during the proceedings.
The defendant described an occasion where the parties took a trip to Maine. He represented that during that trip that the plaintiff walked out into the water of the lake threatening to do away with herself.
The defendant represents that he has ill will as to Mr. Reynolds, who he represents has kept company with his spouse.
From the testimony of the witness Raymond Noyes, the court finds that this gentleman suffers from diabetes, according to his testimony; that he has been acquainted with the plaintiff and the defendant for over ten years; that he attended a birthday celebration for the plaintiff on April 27, 1999; that he was there as a guest along with his girlfriend. He recalls an altercation that occurred at the Chinese restaurant where the parties were gathered and represented that the plaintiff struck the defendant in the face with what was described as a Scorpion bowl. This witness testified that the plaintiff on that occasion was intoxicated and that he saw the plaintiff at the bar in the establishment drinking liquor. He represented that he has seen the plaintiff on other occasions in an intoxicated or violent state.
He acknowledged that the plaintiff and the defendant are both good CT Page 727 parents to the children.
This witness acknowledged on cross examination that he is a close friend to the defendant; that he had not seen or spoken with the plaintiff for over four years.
This witness indicated that the defendant, after the altercation that occurred, left the scene before any authorities arrived.
This witness had no recollection of the defendant receiving the annuity funds of $86,000.00+, however, he acknowledged that he had seen the defendant at the casino and that he had been advised by the defendant that the annuity funds had been received and were apparently the object of gambling activities there.
From the testimony of the witness Nelson Lajoie, the court finds that he is acquainted with the plaintiff and the defendant; has known the defendant for over 30 years. He is a coworker as an ironworker with the defendant. He has worked with the defendant at various locations, both in and out of Connecticut and particularly at a New York job.
This witness testified that he saw wounds on the defendant and cuts on his arm and his back. He testified that he suggested to the defendant that stitches should be in order or medical attention. Apparently that was not done.
This witness also claimed that he observed tears or holes in clothing of the defendant at one of the out-of state job locations.
This witness described himself as a father figure to the defendant; that the parties engaged in hunting activities together. There was a claim made that the defendant may have sustained injuries while involved in deerjacking.
On being recalled to the stand the defendant indicated to the court that he is desirous of having some recognition of his work done on the real estate, which is the home of the plaintiff and the former home of the parties. He testified that a neighborhood property recently sold for $120,000.00.
The defendant indicated that the $273.00 order for support is received weekly by the plaintiff through Support Enforcement and he feels that any requests on her part for alimony is inappropriate. The defendant is willing and content to have the $273.00 continue as support.
The defendant provides medical insurance coverage for the children CT Page 728 including, the defendant claims, medical coverage for another child that resides with the plaintiff issue of an earlier relationship even though he is not the child's natural father.
According to the defendant, the children go to St. Patrick's parochial school and the defendant represents that he pays for the same, which is clearly at variance with the plaintiff's testimony which is more credible.
It is his claim that each party should keep whatever pension benefits they presently have.
The defendant acknowledged having a boat. He represented that he was willing that the plaintiff should have the boat. He acknowledged that there are many charges presently against the vessel and was not even sure where the same was located.
The defendant professed to have an abiding love and affection for the children.
It is the defendant's claim that the parties should have pursued a policy of being divorced one from the other at an earlier point in time.
The defendant expressed his wishes to the court as concerns a visitation schedule with the children and objects to any limitation as concerns that visitation which would preclude him from imbibing with spirits at such time as that might occur, professing that he has "no problem" with alcohol.
The defendant apparently expressed some remorse with regard to the annuity monies and the same being lost at the casino acknowledging that it was a mistake and that he wished that he had done differently.
From the testimony of the witness Jason Coffey; this witness is an acquaintance of the defendant and has known him for ten or 11 years. This witness represented he had assisted the defendant in making improvements to the home and residence including a new roof, two porches, a master bedroom, countertops and matters of like nature. This witness represents that the defendant has put in countless hours as concerns improvements to the home residence.
On being recalled to testify the defendant indicated that he had received between $5,000.00 and $6,000.00 in the near term past in a lump sum incident to the injury that he has sustained. He reaffirmed the 10% disability back injury noting that the injury was of a cervical and not spinal nature. His compensation rate while it was in effect was $670.00 a CT Page 729 week.
The defendant acknowledged that the plaintiff has never been arrested for any alcohol-related offense. He acknowledged that his present position is that of a foreman with the ironworkers and that the foreman rate is $27.00 to $28.00 an hour; overtime is an additional one-half thereof
The defendant claimed that he had not had any intimate relations with one Shirley Daniels and that he has been faithful to the plaintiff.
He acknowledged engaging in hunting activities but professed that he had received no injuries incident thereto.
The defendant again affirmed that he presently has no legal counsel with regard to his open file worker's compensation case.
Upon being shown Plaintiff's Exhibit 5, the same depicting a rather grievous injury on the person of the plaintiff, the defendant denied inflicting the same and claimed that the plaintiff fell down stairs.
As noted, the defendant is age 39; the plaintiff is age 44.
The defendant acknowledged that the plaintiff has never used illegal substances or drugs.
In making inquiry of the defendant by the court, the defendant's explanation as to the grievous bruise that appears in one of the exhibits on her body, was incurred when, in the defendant's words, the plaintiff tackled him and then fell downstairs. The defendant representing that at the time of this incident that he was endeavoring to leave the residence.
From the testimony of the witness Dawn Costa, the court finds that she has been acquainted with the plaintiff and the defendant for at least the last ten years. She described herself as a friend to the defendant and formally a friend with the plaintiff, but the witness testified that this friendship ended two years ago for unexplained reasons. This witness testified that she was formally a close friend to the plaintiff, described the parenting qualities of both the plaintiff and the defendant as good. This witness described the relationship between the plaintiff and the defendant as a very rocky one. The witness testifying that there were incidents of fighting between the parties. The witness acknowledged, however, that the plaintiff stayed in the relationship for the welfare and betterment of the children. CT Page 730
This witness indicated that her present status was that of a student nurse and that she had formally worked as a teacher for mentally retarded children in Gales Ferry.
The witness testified that the plaintiff had related to her problems in the marriage including financial problems.
This witness testified that the plaintiff had allegedly indicated on one occasion that she was in hopes that the defendant would pass away so that she could get in the insurance money.
This witness apparently was one of the parties in attendance at the Chinese restaurant event and acknowledged that she had consumed some alcoholic beverages. This witness was at that event with a boyfriend and represented that she witnessed the altercation that took place.
This witness testified that the plaintiff was upset at that time due to the family dog having recently been put down; that a physical altercation ensued and according to this witness, she observed the plaintiff hit the defendant with the item referred to as a Scorpion bowl; however, the witness also testified that she saw the plaintiff fall, presumably as a result of being struck. This witness indicated that she was presently in a relationship with one Mr. Noyes and that this gentleman is the defendant's best friend.
The witness indicated that she had an arrest record; the nature thereof was not disclosed.
This witness apparently had conferred with the defendant with regard to matters pertaining to the divorce trial proceedings.
The witness testified that she did observe the defendant push the plaintiff by what she called her ponytail at the time of the Chinese restaurant altercation. The witness was familiar with the gambling problems of the defendant and financial problems.
The witness was also aware of the defendant's problems with the immoderate use of alcohol. This witness indicated that she knew of an extramarital affair by the defendant with one Kelly Mortell.
This witness was aware of the fact that the plaintiff had on prior occasions filed petitions looking for a dissolution of the marital union.
This witness apparently is frequently in the company of the defendant on as many as three or four times in one week. CT Page 731
This witness was aware of the defendant's receipt of the annuity monies amounting to $86,000.00+ and observed the defendant spend some of the same at the casino over a period of time.
This witness indicated that in her opinion the defendant no longer has a drinking problem.
The witness testified to observing the defendant at the casino, in her words, wagering thousands of dollars.
This witness characterized the plaintiff as being emotional unstable and has some reservations with regard to the plaintiff's truthfulness; however, the court's observations of the plaintiff during this four-day trial are to the effect that the plaintiff appeared to be forthright and candid with regard to her testimony and the witness Costa's testimony must be viewed on the basis of her relationship with the defendant.
Upon being recalled to the stand the plaintiff testified further as to the original purchase of the home premises which she indicated was for and in consideration of $56,000.00.
The witness also testified with regard to the payoff of a prior mortgage to GMAC in the amount of $55,022.54.
The plaintiff acknowledged an indiscretion with one Peter Reynolds after the parties had finally separated.
The plaintiff was not aware of the extent of the defendant's gambling and the losses incident thereto until the time of coming to court.
The court was asked to judicially notice the magistrate's file.
From the testimony of the witness James Gobes; this witness is trained as an actuary and indicated the requirements which he must achieve or pass in order to have that title and to do the work in which he is engaged. He has worked for Connecticut General Life for 20 years. He works as a consulting actuary since 1992. He has apparently participated in depositions having to do with dissolutions of marriage on 20 to 30 occasions.
He has apparently testified on many and diverse occasions with regard to legal actuarial matters in court. The witness was accepted as an expert.
The witness Gobes indicated that he had been provided with certain CT Page 732 documents incident to trying to establish a value for the defendant's pension benefits. He valued the marital portion of defendant's pension at $31,815.00. This apparently calculated at age 65 and then computed or adjusted as to the plaintiff's actual age. He testified that the value of the plaintiff's pension was $93,698.00 and that there would be an accrued benefit to the plaintiff at age 65 of $1,131.00 a month or at 55 years of age after 25 years of service.
The witness testified that pension benefits under the Ironworkers' Union system require employment for a period of 30 years. The defendant has apparently been involved in this type of work for 16-1/2 years.
His benefit at age 65 would apparently be in the amount of $1,320.00 a month and the witness indicated that there was presently no cash in value on the defendant's pension benefits at this time.
The witness testified as to the length of service with the Ironworkers' Union involving the defendant as being 16-1/2 years and computed the present value of the defendant's pension at $34,174.00. Apparently between $75.00 and $80.00 is added each month as a credit to that pension benefit.
In testifying further as concerns the plaintiff's pension, as earlier noted, the witness evaluated the same at $93,698.00 but indicated that the total value thereof was $113,259.00.
From the testimony of the witness Neil McKeever, the court finds that Mr. McKeever is a Family Relations Officer associated with the Superior Court of the State of Connecticut. He has been employed in the Family Relations area for the last 26 years and prior to that worked for the Division of Children and Youth Services for six years.
He has met with the plaintiff and the defendant and the three children issue of this marriage. His initial participation in the matter had to do with visitation.
The witness prepared several reports concerning his involvement in matters pertaining to the plaintiff and the defendant and the three children. (See Plaintiff's Exhibit 3 and 4.)
This witness' recommendation to the court was to the effect that there should be joint legal custody between the plaintiff and the defendant as to the three minor children with the plaintiff mother being the primary custodial parent and provision made for visitation by the defendant with the children. Particular reference is made to Plaintiff's Exhibit 3 at pages 5 and 6 as concerns the witness McKeever's recommendations to the CT Page 733 court.
This witness' testimony was to the effect that the defendant consumed copious quantities of alcohol and that this affected his demeanor and conduct while he was under the influence. McKeever indicated that it was his feeling that the children were frightened of the defendant when he would be imbibing in alcohol.
The witness testified as to the defendant having three DWI arrests and in the witness' words, that the defendant consumes a 12-pack a week.
The witness has reservations about visitation by the defendant with the children if he has been drinking. McKeever recommended reasonable telephone contact with the children and indicated that out-of-state visitation to the three states closest to Connecticut; to wit, New York, Massachusetts and Rhode Island, would be acceptable on 30 days prior notice.
McKeever also indicated that in the event that the defendant is tardy in his visitation that at least an hour's grace should be accorded to him.
On this witness' inquiry into the matter, it appears that the defendant sometimes does not show up for visitation and that this has been verified by the plaintiff and the children.
The witness McKeever's recommendation as to summer vacations to the court was that this should be left to another day.
From the exhibits the court finds as to Plaintiff's Exhibit 1, an appraisal of real estate for property located at 86 McKinley Avenue in Norwich performed by James B. Blair of the Riess Appraisal Company. This appraisal report values the property as of November 28, 2001 at $82,500.00. The appraisal appears to be detailed and comprehensive. A variety of photographs accompany the exhibit showing a variety of views of the property. A number of comparables are also shown and depicted in photographs. The property is situated on an area consisting of .08 acres. The appraisal describes the subject premises as an older home which has been partially updated, however, still needs attention; no special features noted.
From Plaintiff's Exhibit 2, a collection of sheets and statements from the Mohegan Sun Casino, with various dates shown thereon in December of 2001 and showing at least partial losses by the defendant in his gambling activities at the casino including a loss on December 7, 2001 in the amount of $2,761.00, another loss of $30,206.50, various small amount CT Page 734 losses.
Plaintiff's Exhibit 3 and 4 are detailed reports prepared by the witness McKeever which are too lengthy to be set out in this memorandum but are quite comprehensive and would seem to sustain the plaintiff's testimony, observations and representations as concerns the conduct of the defendant, his immoderate use of alcohol and the substantial losses which he incurred at the casino, which manifestly has substantially prejudiced the financial stability for this family and has, to a large extent, eroded the prospect for higher education for the three children because of the defendant's conduct.
Plaintiff's Exhibit 5, already referred to, in fact discloses a grievous bruise on the person of the plaintiff, in the court's opinion, inflicted by the defendant at a point in time when she was five months pregnant.
Plaintiff's Exhibit 6 is a personal information statement sheet concerning the plaintiff and her medical and dental benefits and prospective pension benefits and life insurance and the beneficiaries thereof, which include the three minor children issue of this marital union.
Plaintiff's Exhibit 7; this is the Consent of Spouse form which the plaintiff testified the defendant fraudulently induced her to sign on the representation that she would receive half of the annuity funds; the same to be used for the prospective educational purposes of the children. On the face of the form, it indicates that the value thereof is $102,600.45. It was apparently signed by the plaintiff on July 11, 2000 after the representations and promises of the defendant as earlier averted to. Needless to say, the plaintiff never received a penny.
Plaintiff's Exhibit 8 is a joint U.S. Individual Income Tax Return for the year 1995 showing total income of $53,534.00, including $2,700.00 of gambling winnings. A portion of this exhibit shows the defendant's income for that calendar year from Berlin Steel Construction to the amount of $38,615.94. The exhibit also shows the receipt by the defendant of unemployment compensation benefits of $2,220.00 plus the further sum of $2,326.00.
The plaintiff's income in 1995 as reflected in one of the W-2's attached to the exhibit indicates that her income in that year was $8,666.37. A State of Connecticut tax return form for the same year was attached to this exhibit.
From Plaintiff's Exhibit 11, a financial affidavit filed by the CT Page 735 defendant on December 13, 2001 indicating that his gross weekly wage was $1,038.01; deductions of $691.61 for a net of $346.40. The itemized deductions however are not shown on this exhibit but on a separate schedule exhibit.
On this exhibit the defendant values the 21 Wightman Road, New London property at $3,500.00, the 86 McKinley Avenue, Norwich property at $110,000.00 with a mortgage of $45,000.00 for an equity of $32,500.00. The defendant shows a 1997 Chevrolet automobile with a minus equity of $1,500.00, personal property, $5,000.00, a pension value in ink shown as $34,174.00, an annuity fund through the union of $5,000.00, which apparently is the result of accruals from and after the time of the withdrawal of the $86,000.00 and the spending thereof This financial affidavit is dated December 13, 2001.
See Defendant's Exhibit 1, a statement by the witness James A. Gobes, consulting actuary, indicating the present value of the defendant's pension to be $34,174.00.
Defendant's Exhibit 3 is a computation and statement from the State of Connecticut, Support Enforcement Division with regard to support payments made by the defendant through Support Enforcement for the maintenance, welfare and benefit of the three children. The weekly amount is $273.00.
Defendant's Exhibit 4, a photograph showing the defendant and the youngest child of this marital union, Maria Rose; certainly a very lovely looking child.
Defendant's Exhibit 5, a photocopy of a draft to the State of Connecticut for the $273.00 weekly support payments.
Defendant's Exhibit 6 is to the same force and effect verifying the weekly support orders.
Defendant's Exhibit 7 is a portion of a newspaper known as the Lyme/Old Lyme/Waterford News, a portion of The Day newspaper dated April 29, 1999, as concerns an article entitled, "Wife's Birthday Night Out Ends in Brawl with Husband." It is the court's understanding that this event, which occurred at the Golden Palace restaurant, resulted in the arrest of the defendant but the plaintiff was not arrested.
Defendant's Exhibit 8, a statement as concerns the payout made to the defendant, Scott L. Defosse, which after deductions amounted to $86,888.24. This is the sum which was gambled away at the casino. The gross amount before that check was issued and delivered over to the defendant was $108,610.30, but certain deductions were made therefrom to CT Page 736 the amount of $21,722.06.
Defendant's Exhibit 9, a photocopy of a warranty deed from Margaret Lincoln to Michael E. Minzy and Virginia E. Minzy describing the premises on the westerly side of McKinley Avenue in Norwich. Virginia E. Minzy is the present plaintiff.
This deed and the accompanying mortgage were dated May 1, 1984 and verified the purchase price of the property at $56,000.00.
Defendant's Exhibit 10, another photograph showing the defendant and two of the children issue of this marriage; again, very attractive children.
Defendant's Exhibit 11, quitclaim deed from Virginia E. Defosse establishing title in her name and that of the defendant and survivorship form as concerns the property on McKinley Avenue. This was dated January 5, 1994.
Subsequently, the defendant conveyed his fractional interest in the property back to the plaintiff so the title now stands solely in the name of the plaintiff This by virtue of an instrument dated August 9, 1996.
Defendant's Exhibit 12, a statement from the witness James Gobes to the defendant's counsel valuing the plaintiff's pension benefits in projected form as being $3,447.00 a month at age 65.
Defendant's Exhibit 14, a statement under the signature of the deputy chief clerk for GA 18 showing an arrest record for the defendant charging the defendant with assault third and disorderly conduct. The form indicating, however, that the charges were nolle pros on August 20, 1999.
From the financial affidavits of the parties filed at the time of trial, the court finds as to the plaintiff: her occupation is that of a mental health case manager with the Department of Mental Health and Addiction Services, East Hartford office. Gross weekly wage $602.50. Total deductions for taxes, social security, med, union and state tax, $159.10, for a net of $443.40. Total weekly expenses show $935.22. The financial affidavit apparently does not reflect the $273.00 support order which has been in place for some time and apparently regularly received through Support Enforcement.
Debts of the plaintiff amount to $9,700.00 of which a substantial portion are attributable to a loan that the plaintiff was required to take out to settle tax matters that were the tax liability in fact of the CT Page 737 defendant because of his failure to have the employer withhold certain funds from his earnings.
The plaintiff values the 86 McKinley Avenue, Norwich property at $85,000.00, mortgage of $57,000.00, with a resultant equity. She shows a 1993 Dodge Caravan motor vehicle valued at $12,000.00 with a loan balance of $17,779.00 for a minus equity. No personal property of any value. $1,000.00 in her checking account, $500.00 in a savings account. No cash value to any life insurance. Total cash value of all assets shown on her financial affidavit amount to $21,500.00. The principal portion thereof being the equity in the McKinley Avenue property.
From the defendant's financial affidavit, gross weekly wage, $1,038.01; deductions of $691.61, reference is made to a Schedule A, which is not attached to the financial affidavit, for a net of $346.40; weekly expenses claimed at $893.00. Debt shown as a total of $10,040.00. The 21 Wightman Road property in New London is valued at $3,500.00. The 86 McKinley Avenue property valued at $110,000.00 with a claimed mortgage of $45,000.00, which would appear to be erroneous, with an equity claimed of $32,500.00. A 1997 Chevrolet S-b pickup with a minus equity of $1,500.00. Personalty, furnishings and so forth, $5,000.00. No cash value to any life insurance. Pension valued at $34,174.00 and a current annuity from after the spending of the $86,000.00 now shown as being valued at $5,000.00.
 The Law
The court has considered all of the statutes which apply in matters of this nature which include without limitation Connecticut General Statutes (C.G.S.) §§ 46b-82 regarding alimony, 46b-62 regarding attorney's fees and 46b-55, 46b-83 and 46b-84 as concerns support.
The court has considered all of the applicable case law that governs the matter.
The court has considered the testimony of the parties, their candor or lack thereof and all exhibits and the arguments of counsel.
In considering the issue of alimony, the court has considered the length of the marriage, the cause of the breakdown or dissolution, the age, health, station, occupation and employability of each of the parties and the estate and needs of the parties.
The court has considered the standards of living of the parties.
As concerns the three minor children, Joseph Scott Defosse, David Louis CT Page 738 Defosse and Maria Rose Defosse, the court has considered their ages and their present circumstances.
The court has considered the relationship such as it is between the defendant and the children, the length and intimacy or lack thereof as concerns that association and the problems that will beset the plaintiff with regard to educating the three minor children mindful of the actions of the defendant.
The court has considered the respective financial positions of the plaintiff and the defendant, their prospects for future income and opportunities.
The court has considered the issue of fault.
 Discussion
This is a marriage of 13+ years duration.
Three minor children issue of this marriage; ages 11, 10 and 6.
There have been continuing problems involving the immoderate use and abuse of strong drink and alcoholic beverages in this marriage on the part of the defendant. This immoderate course of conduct has also resulted in frequent observed instances of physical violence to the plaintiff petitioner.
Gambling activities on the part of the defendant manifestly have caused another serious issue in the relationship.
During the marital union, the defendant has for substantial periods of time in effect abandoned the plaintiff and the children; particularly during the pregnancies of the plaintiff
Although the plaintiff has endeavored to keep the financial matters involving the family under control, the defendant has made this extremely difficult for her by virtue of arrangements with his employer whereby no deductions were being taken out for taxes, federal or state, resulting in due course in a substantial tax liability to the IRS or the State, which obligations and debts were left primarily at the door of the plaintiff for the purpose of solution.
In addition, the defendant has, in the court's opinion, deceived the plaintiff and been untruthful to her especially as concerns the inappropriate drawing from the annuity account of the large sum referred to in the body of this opinion and then instead of keeping his promises, CT Page 739 pocketing the entire sum and allegedly squandering the same at the casino, all to the detriment of the plaintiff and particularly the children.
The plaintiff, as observed by the court during the conduct of this four-day trial, appeared to be honest, candid and reserved. It would appear that the plaintiff is and has been a hard worker during the marriage and has endeavored to preserve the same.
It would appear, although not clearly shown, that there have been some indiscretions by the defendant during the marriage and the court acknowledges that after the last lengthy separation that the plaintiff admitted to an indiscretion on her part.
The court is fairly well satisfied that, in the words of one of the witnesses, the plaintiff does live for her children, all of whom, according to photographs in the file as exhibits, appear to be well nourished, good looking children.
The court notes that the defendant did not use his wampum card during his gambling activities that led to the alleged total loss of all of the annuity funds. The card was used for some gambling activities but not for the major portion thereof and although the plaintiff's financial affidavit and position is to the effect that the entire sum is gone, the court has some concern that the lack of use of the wampum card was an intentional course of conduct whereby some funds might be set aside and secreted by the defendant. There was of course no reliable, credible evidence with regard to that course of conduct.
The court is mindful of the defendant's testimony as to certain medical problems pertaining to the removal of cervical discs because of an injury incident to his employment.
The defendant professes that he has an abiding love and affection for the children but his squandering this major asset of the marriage would seem to undermine that position.
Clearly, on the basis of the testimony, the problems pertaining to alcohol in this marriage have been severe resulting in the DMI arrests noted in the body of the memorandum and the assault charge, which admittedly according to the exhibit, was nolle pros.
There was no evidence presented to the court that the plaintiff had any arrest record.
The court is inclined to the view that insofar as issues of credibility CT Page 740 are concerned that the testimony of the plaintiff and the witnesses on her behalf have on balance been more credible than the testimony by the defendant or witnesses offered on his behalf
The court feels, based on the testimony presented at trial, that there was a continuing pattern of physical violence inflicted on the plaintiff by the defendant; admittedly attributable to, in the court's opinion, the immoderate resort to alcohol.
In addition, mindful of the comments already made, the court is unable to understand how the defendant, professing love and affection for three lovely children, could follow the course that he did, allegedly losing the entire sum at the casino. In following this course, the defendant has, to a large extent, created financial ruin for the family and lost the ability of the parents to provide for further education including college education for these three children. The court feels that this course of conduct was absolutely without justification of any sort.
The court enters the following orders:
As to the issue of custody, the plaintiff and the defendant shall share joint legal custody of the three minor children; Joseph Scott Defosse, born March 11, 1989, David Louis Defosse, born October 29, 1991, and Maria Rose Defosse, born April 21, 1995, with the plaintiff mother being the primary resident and custodial parent.
On the basis of the agreement between the parties and negotiated with the assistance of the Family Relations Division of the Superior Court, the court orders that the defendant father shall have visitation access with said minor children as follows: on alternate weekends from Saturday at 9:00 a.m. overnight until Sunday at 6:00 p.m., subject to 24-hour prior notice to the plaintiff mother; Wednesday evenings from 5:00 p.m. until 7:00 p.m. during the school year and from 5:00 p.m. until 9:00 p.m. during school vacations subject to 24-hour prior hour notice to the plaintiff mother. During odd-numbered years the defendant father shall have the children for the holidays of New Year's Day, Easter and Labor Day from 10:00 a.m. until 6:00 p.m. and include the preceding overnight when these holidays occur consecutive with his regularly scheduled access to the children.
On those years the plaintiff mother shall have the children for the holidays of Memorial Day, Independence Day and Thanksgiving with such to occur from 10:00 a.m. until 6:00 p.m. when it conflicts with the defendant father's regularly scheduled time with the children. During even-numbered years the parties shall reverse this holiday schedule. CT Page 741
The defendant father shall have the children annually for Father's Day from 10:00 a.m. until 6:00 p.m.
The plaintiff mother shall have the children annually on Mother's Day with such holiday to commence at 10:00 a.m. on those occasions it conflicts with the defendant father's access to the children.
The defendant father shall have the children annually on Christmas Day from 3:00 p.m. overnight until December 26th at 6:00 p.m. On odd-numbered years he should also have the children on Christmas Eve Day from 3:00 p.m. until 8:00 p.m.
The plaintiff mother shall have the children for Christmas Eve on odd-numbered years from 8:00 p.m. until Christmas Day at 3:00 p.m.
During even-numbered years the plaintiff mother shall have the children on December 24th at 3:00 p.m. until Christmas Day at 3:00 p.m.
The defendant father shall exercise all access to the minor children alcohol free.
If the defendant father is more than 60 minutes late for his visitation with the minor children without good cause or reason, he shall forfeit said visitation.
The defendant father shall return the children promptly to the plaintiff mother's residence in accordance with the times set forth above.
The plaintiff mother shall be provided with reasonable telephone access with the minor children during the defendant's weekend access and she shall be generally apprised of the children's location.
The defendant father shall not remove the minor children from the State of Connecticut without prior written notice and discussion and without written agreement with the plaintiff mother.
If the minor children have activities during said access time with the defendant father then the defendant father shall transport the minor children to said activities.
As to the issue of support, the defendant shall pay to the plaintiff, in accordance with the orders entered in the Magistrate Division of the Superior Court, the sum of $273.00 per week by way of Immediate Wage Withholding and through the State of Connecticut and the Support Enforcement Division. CT Page 742
Any and all arrearages regarding support and any and all arrearages regarding unreimbursed medical bills shall be preserved and/or found to be in the amount of $1,769.12 and shall be paid to the plaintiff within 90 days.
As to medical insurance, each party shall be responsible for their own medical insurance and they shall be responsible to pay their own unreimbursed and uncovered medical health-related expenses. Both parties shall maintain medical insurance as available at their place of employment at reasonable cost for the benefit of the minor children.
The parties shall split all uncovered unreimbursed medical health-related expenses as follows: 59% by plaintiff and 41% by the defendant.
As to the marital residence, the plaintiff shall be permitted and entitled to retain her interest in and to the marital residence located at 86 McKinley Avenue, Norwich, Connecticut, which residence she brought into the marriage.
The defendant shall waive any and all interest he may have and claim in and to said property.
As to debts, the Beneficial loan incurred for the payment of the defendant's taxes, the total amount of said debt was $4,500.00. The outstanding balance is $1,600.00. Mindful of the manner in which this debt was incurred and the sums already paid by the plaintiff, the defendant shall pay the remaining balance of said debt, which is to the amount of $1,600.00±.
As to the Sears card debt in the amount of $3,000.00 incurred primarily for the defendant's purchase of tools, clothing and so forth, this debt shall be equally apportioned between the plaintiff and the defendant, one half as to each. It would appear, mindful of what the plaintiff has already paid as to the Sears debt, that the defendant shall be responsible for the remainder thereof
As to the First USA Visa debt incurred for family vacations in the approximate amount of $2,000.00, the plaintiff and the defendant shall be equally responsible for the orderly payment and liquidation of this debt.
As to the debt to CitiBank, again incurred for family vacations, the same being in the original amount of $4,500.00, the parties shall each be responsible for one half thereof in the orderly liquidation of said CT Page 743 debt.
The debt to Fingerhut shall be the sole responsibility and obligation of the plaintiff
As to the annuity fund formerly held by the defendant incident to his employment with Ironworkers' Local 15, it would appear based on the testimony or the exhibits that the account had a balance as of June 30, 2000 in the amount of $1 13,031.30. The defendant, according to the testimony, received either $86,000.00± or $90,425.04 and his testimony is to the effect that the entire amount has been lost and gambled away at the casino.
The court believes that the defendant fraudulently induced the plaintiff to execute a consent which allowed him to secure these funds. Whether in fact all the funds have been lost or whether a portion thereof may have been secreted and hidden from the plaintiff is an unknown factor at this time.
In any event, the plaintiff shall be entitled to have and receive one half of any funds subsequently found to be hidden or secreted as concerns the annuity proceeds that may not have been gambled away.
This obligation shall not dischargeable in bankruptcy.
The plaintiff may retain as her sole and separate property her pension benefits as they presently exist.
The plaintiff shall have and receive one half of any remaining pension to which the defendant is entitled valued as of the date of this memorandum by way of a Qualified Domestic Relations Order (QDRO). The court shall retain jurisdiction over said QDRO until the same is effectuated.
As to alimony, the defendant shall pay to the plaintiff $100.00 per week for a period often years. The alimony may terminate earlier on the death of either party, the remarriage of the plaintiff or her cohabitation with an unrelated male as interpreted by the statute.
The alimony shall be taxable to the plaintiff and deductible by the defendant.
Each party shall maintain such items of personal property as are currently in their possession. The defendant may retain whatever interest he presently has in the boat or vessel that was testified to at trial. The defendant shall be entitled to a share of the family photographs, a CT Page 744 certain deer wall mount and his tools.
The defendant shall maintain the plaintiff and the minor children as irrevocable beneficiaries on any and all life insurance available through his employment for as long as he has a child support and/or alimony order payable to either the plaintiff or the minor children.
The defendant shall supply verification that he has maintained said parties on his insurance at least yearly and upon written request of the plaintiff to ensure that said policy is in full force and effect.
As to the workers' compensation claim still pending, the court directs that the defendant shall disclose to his counsel the status of any workers' compensation suit or claim and the defendant shall execute an authorization to enable counsel for the plaintiff to verify the status thereof and any proceeds received incident thereto.
The defendant shall be entitled to take the three children as tax exemptions as long as the support payments are current.
The defendant may retain the real estate known as 21 Wightman Road in New London.
Each party shall pay their respective witness fees and attorney fees.
The court grants the relief prayed for and dissolves the marriage on the grounds of irretrievable breakdown and declares the parties to be single and unmarried.
 ___________________ Austin, J.